UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



_____

CHRISTINA COSTA,

                 Plaintiff,

      v.

SEARS HOME IMPROVEMENT PRODUCTS,
INC. and SEARS HOLDINGS CORPORATION,

           Defendants.

_____

**DECISION AND ORDER**

12-CV-6235 EAW

## INTRODUCTION

Plaintiff Christina Costa ("Plaintiff") brings this retaliation action against Defendants Sears Home Improvement Products, Inc. ("SHIP"), and Sears Holdings Corporation (collectively, "Defendants") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"). (Dkt. 1). Plaintiff alleges Defendants terminated her employment in unlawful retaliation for her participation in various protected activities. (*Id.*). Presently before the Court is Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. 18), Plaintiff's Motion for Sanctions and Motion to Compel pursuant to Fed. R. Civ. P. 37 (Dkt. 23), and Defendants' request for sanctions pursuant to Fed. R. Civ. P. 11 (Dkt. 32 at ¶ 60). For the reasons set forth below, these motions and requests are denied.

## FACTUAL AND PROCEDURAL BACKGROUND

SHIP is a wholly-owned subsidiary of Sears, Roebuck, and Co. which is a wholly owned subsidiary of Defendant Sears Holdings Corporation.  (Dkt. 18-1 at ¶ 1; Dkt. 22-1 at ¶ 1).

SHIP provides home improvement services to customers, and employs salespeople who work out of an office but meet with customers in their homes to discuss SHIP's home improvement services.  (Dkt. 18-1 at ¶ 2; Dkt. 22-1 at ¶ 2).  Local SHIP offices maintain a staff of employees who support the salespeople and sales contracts with customers.  (Dkt. 18-1 at ¶ 2; Dkt. 22-1 at ¶ 2).

In 2002, Plaintiff began working for SHIP as a sales representative at its Rochester office.  (Dkt. 18-1 at ¶ 3; Dkt. 22-1 at ¶ 3).  Approximately two years after she was hired, Plaintiff applied for and was offered the position of office coordinator for the Rochester office, an hourly position.  (Dkt. 18-1 at ¶ 5; Dkt. 22-1 at ¶ 5).

Plaintiff's position entailed tracking paperwork for sales contracts, entering production part orders, processing payments for subcontractors, training new sales representatives, and answering phones.  (Dkt. 18-1 at ¶ 6; Dkt. 22-1 at ¶ 6; Dkt. 18-3 at 11-12, 21-22).  Plaintiff supervised one person, Maria Paris, a "branch assistant," whose position involved assisting Plaintiff in her office coordinator duties.  (Dkt. 18-1 at ¶ 7; Dkt. 18-3 at 12; Dkt. 18-4 at 6:10-14; Dkt. 22-1 at ¶ 7).

While employed as office coordinator, Plaintiff received performance evaluations of "consistently meeting expectations" and "far exceeding" expectations.  (Dkt. 18-1 at ¶ 8; Dkt. 22-1 at ¶ 8).  Plaintiff also received awards for her performance, such as being

"top in the company" for her position three years in a row and winning an all-expense paid cruise.  (Dkt. 18-1 at ¶ 8; Dkt. 22-1 at ¶ 8; Dkt. 18-3 at 64, 70-71; Dkt. 18-7 at ¶ 5; Dkt. 22-11 at ¶ 6).

In late 2008, SHIP restructured internally, and Plaintiff and Ms. Paris' job titles changed so that both held the position of "District Administrator."  (Dkt. 18-1 at ¶ 9; Dkt. 22-1 at ¶ 9; Dkt. 18-4 at 6:10-14; Dkt. 18-7 at ¶ 6; Dkt. 22-11 at ¶ 7).  Ms. Paris became Plaintiff's equivalent in the office.  (Dkt. 18-1 at ¶ 10; Dkt. 22-1 at ¶ 10; Dkt. 18-4 at 6:10-14).

Prior to February 2008, Michelle Kielbasinski, a Field Sales Representative out of SHIP's Rochester office, filed a complaint against Defendants and Sears, Roebuck & Co. with the New York State Division of Human Rights ("NYSDHR"), claiming that she had been discriminated against in her employment.  (Dkt. 18-1 at ¶ 11; Dkt. 22-1 at ¶ 11; Dkt. 18-4 at 111).

In February 2008, the NYSDHR held a hearing concerning Ms. Kielbasinski's NYSDHR complaint.  (Dkt. 18-1 at ¶ 12; Dkt. 22-1 at ¶ 12; Dkt. 18-4 at 102:2).  Ms. Kielbasinski asked that Plaintiff testify at the February 2008 hearing on her behalf, and Plaintiff agreed.  (Dkt. 18-1 at ¶ 13; Dkt. 22-1 at ¶ 13; Dkt. 18-3 at 27, 30; Dkt. 18-4 at 100:23-25; 101:2-3).  Plaintiff alleges that Regional Human Resources Manager Charles Klinzing, District General Manager Joseph Altieri, and Regional Sales Manager Joseph Pinchbeck were present at the February 2008 hearing.  (Dkt. 22-11 at ¶ 8).

In September 2008, Plaintiff received another performance review, where she again was rated as "consistently meeting" or "exceeding" expectations.  (Dkt. 18-1 at

¶ 14; Dkt. 22-1 at ¶ 14).   However, Plaintiff alleges that after testifying, one of Defendants' regional managers, Joseph Pinchbeck, "warned Plaintiff that she should be a good employee and made veiled threats including telling Plaintiff 'the company did not like loose lips.'" (Dkt. 18-3 at 27; Dkt. 22-1 at ¶ 14; Dkt. 22-11 at ¶ 9).   Plaintiff claims that from January 2009 through Spring 2009, Plaintiff witnessed a number of "very disturbing events" occurring at work to Ms. Kielbasinski, and Plaintiff claims that she asked Mr. Salvaggio, District General Manager, to take action in response to each of these events.   (Dkt. 22-1 at ¶ 14; Dkt. 22-11 at ¶¶ 10-11).   Plaintiff claims that Mr. Salvaggio told her that these events were none of her business.   (Dkt. 22-1 at ¶ 14; Dkt. 22-11 at ¶ 11).   After Ms. Kielbasinski quit her position in March 2009, Plaintiff alleges that Mr. Salvaggio told Plaintiff, "[t]he problem is gone; enough of this drama.   You need to be a team player." (Dkt. 22-1 at ¶ 14; Dkt. 22-11 at ¶ 11).   Plaintiff claims that Mr. Salvaggio then told her he did not care how long someone had worked for Sears and that he would terminate them if they caused problems.   (Dkt. 22-1 at ¶ 14; Dkt. 22-11 at ¶ 12).   According to Plaintiff, Mr. Salvaggio made similar threats throughout 2009.   (Dkt. 22-1 at ¶ 14; Dkt. 22-11 at ¶ 13).

Plaintiff alleges that, prior to December 2009, Ms. Kielbasinski's attorney requested that Plaintiff submit an affidavit to the NYSDHR on Ms. Kielbasinski's behalf. (Dkt. 18-1 at ¶ 15; Dkt. 22-1 at ¶ 16; Dkt. 1 at ¶ 16).   Plaintiff claims that she prepared and delivered the affidavit directly to the NYSDHR in December 2009.   (Dkt. 18-1 at

¶ 16; Dkt. 22-1 at ¶ 16; Dkt. 1 at ¶ 17).[1]  According to Plaintiff, she told Ms. Paris about filing this affidavit and expressed her concerns that she would be fired in retaliation. (Dkt. 18-1 at ¶ 18; Dkt. 22-1 at ¶¶ 16, 18; Dkt. 22-11 at ¶ 23; Dkt. 18-3 at 37-38). However, Ms. Paris does not recall Plaintiff telling her that she submitted an affidavit on Ms. Kielbasinski's behalf.  (Dkt. 18-1 at ¶ 19; Dkt. 22-1 at ¶ 19; Dkt. 18-4 at 14:20-24; 15:7-23).

On December 1, 2009, the NYSDHR held a hearing concerning Ms. Kielbasinski's allegations.  (Dkt. 22-1 at ¶ 16).  Some of SHIP's representatives, including Mr. Salvaggio, Mr. Klinzing, and Mr. Pinchbeck were at the December 2009 hearing.  (Dkt. 22-1 at ¶ 16; Dkt. 22-11 at ¶ 8).  Plaintiff's name was raised at the hearing, and Ms. Kielbasinski's attorney named Plaintiff as an individual available and willing to discuss Ms. Kielbasinski's allegations that she was not afforded annual reviews.  (Dkt. 22-1 at ¶ 17; Dkt. 22-7 at 18-19).

Plaintiff alleges that, shortly after the December 2009 NYSDHR hearing, Plaintiff was no longer included in weekly management team meetings, and was told by Mr. Salvaggio to "speak only when spoken to."  (Dkt. 22-11 at ¶¶ 18-19).  Plaintiff claims that Mr. Salvaggio then stopped any communication "except necessary instructional talk" with Plaintiff until her termination five months later.  (*Id.* at ¶ 22).

---

[1]     Although Plaintiff alleges in her Complaint that Ms. Kielbasinski's complaint was before the U.S. Equal Employment Opportunity Commission ("EEOC"), and that she testified for and submitted an affidavit to the EEOC, the documents produced in this matter related to Ms. Kielbasinski's complaint show that her complaint and hearing were before the NYSDHR.  (Dkt. 18-4 at 111).

Mr. Kirnan and Mr. Salvaggio testified that Plaintiff started having job performance issues in 2009 that were a frustration to other employees in the Rochester office, and that by March 2010, these issues were "prevalent" and "inhibiting." (Dkt. 18-1 at ¶ 21; Dkt. 18-4 at 57:11-12; Dkt. 18-7 at ¶¶ 8-12). Reportedly, Plaintiff questioned instructions from managers, refused to follow instructions, researched projects outside of her job description, and was often tardy for work. (Dkt. 18-1 at ¶ 22; Dkt. 18-4 at 48:17-19; 49:11-12; Dkt. 18-4 at 11:10-19; Dkt. 18-7 at ¶¶ 8-9). According to Mr. Salvaggio, although Plaintiff was scheduled to work from 8:00 a.m. to 5:00 p.m. Monday through Friday, she would "frequently" arrive 20-30 minutes late "most days." (Dkt. 18-7 at ¶ 8). In addition, Mr. Salvaggio stated that after Plaintiff's husband became one of the SHIP subcontractors in 2010, Plaintiff would "scrutinize" the paperwork for her husband's sales contracts, to ensure that he was receiving all of the pay to which she believed he was entitled. (*Id.* at ¶ 15). Mr. Salvaggio testified that Plaintiff would sometimes take the paperwork home with her, and that this was a confidentiality issue and was outside of Plaintiff's job description. (*Id.*).

Plaintiff claims that in this time period, a co-worker, Mr. Regnet, told Plaintiff to approve paperwork that Plaintiff believed to be inappropriate, and she investigated potential circumstances of double billing and overpayment. (Dkt. 22-1 at ¶ 22; Dkt. 22-11 at ¶ 28). Plaintiff claims that she took her concerns to Mr. Salvaggio and was told to do what Mr. Regnet said, despite the fact that Plaintiff believed the actions would be in violation of company policy. (Dkt. 22-1 at ¶ 22; Dkt. 22-11 at ¶ 29).

Mr. Salvaggio testified that he began to document Plaintiff's performance issues in June 2009. (Dkt. 18-1 at ¶ 23; Dkt. 18-7 at ¶¶ 10-11, Dkt. 18-8 at 5-6). However, Plaintiff claims that these personal notes were shredded by Defendants in December 2012. (Dkt. 22-1 at ¶ 23). Plaintiff reportedly did not receive a formal performance review in 2009 due to a wage freeze. (Dkt. 18-7 at ¶ 11). From January to March of 2010, Mr. Salvaggio stated that Plaintiff arrived late for work on seven occasions, and this lateness was recorded in his "personal notes." (Dkt. 18-7 at ¶ 12). Plaintiff claims that she was never informed of any performance issues in 2009. (Dkt. 22-1 at ¶ 21; Dkt. 22-11 at ¶ 24). Plaintiff also alleges that she was the only employee in the Rochester office who did not receive a mandatory review in March 2010. (Dkt. 22-11 at ¶ 32).

Mr. Salvaggio contacted SHIP's Human Resources department in March 2010 for guidance on how to address Plaintiff's conduct. (Dkt. 18-1 at ¶ 24; Dkt. 18-7 at ¶ 13). Mr. Salvaggio then prepared a performance plan for improvement ("PPI") entitled "Documentation of Performance Issues," that addressed, among other things: (1) Plaintiff "investigates and audits projects which do not fall under her job description;" (2) Plaintiff "regularly questions instructions from management;" (3) Plaintiff "takes it upon herself to make decisions on matters that have nothing to do with her;" and (4) if Plaintiff "is asked to do something she feels she is owed an explanation before doing it." (Dkt. 18-1 at ¶ 25; Dkt. 22-1 at ¶ 25; Dkt. 18-7 at ¶¶ 13-16; Dkt. 18-3 at 76-77). The PPI also stated that Plaintiff had been tardy on at least seven occasions, and that she did not reflect her tardiness on her timecard. (Dkt. 18-1 at ¶ 26; Dkt. 22-1 at ¶ 26; Dkt. 18-3 at 76-77). The PPI warned that submission of "intentionally falsified timesheets constitutes a terminable

policy violation." (Dkt. 18-1 at ¶ 28; Dkt. 22-1 at ¶ 25; Dkt. 18-3 at 76-77; Dkt. 18-8 at 8-10).

Prior to April 2010, there was no time clock in SHIP's Rochester office, and each employee was required to keep track of his or her time manually. (Dkt. 18-1 at ¶ 27; Dkt. 22-1 at ¶ 27; Dkt. 18-7 at ¶ 17). According to Mr. Salvaggio, the District Administrators would deliver their timecards to Mr. Salvaggio at the end of the week, Mr. Salvaggio would sign each timecard, and they would be faxed to the SHIP corporate office in Pittsburgh by a District Administrator. (Dkt. 18-7 at ¶ 17).

SHIP's Code of Conduct states that falsification of time records is an infraction that can lead to termination of employment. (Dkt. 18-1 at ¶ 29; Dkt. 22-1 at ¶ 29; Dkt. 18-5 at ¶ 6). This Code of Conduct is contained in the Associate Handbook that is provided to all employees. (Dkt. 18-1 at ¶ 30; Dkt. 22-1 at ¶ 30; Dkt. 18-5 at ¶ 6).

On April 5, 2010, Mr. Salvaggio met with Plaintiff to deliver the PPI. (Dkt. 18-1 at ¶ 31; Dkt. 22-1 at ¶ 29; Dkt. 1 at ¶ 19; Dkt. 18-7 at ¶ 20). Defendants claim that Plaintiff and Mr. Salvaggio discussed the tardiness and timesheets issue. (Dkt. 18-1 at ¶ 32; Dkt. 18-7 at ¶ 20). Plaintiff claims that there was no discussion of the PPI. (Dkt. 22-1 at ¶ 31). Plaintiff notes that the PPI stated that Mr. Salvaggio would assist Plaintiff with improvements if she submitted an incorrect timesheet, and that Mr. Salvaggio testified that the purpose of the PPI was not to terminate Plaintiff, but to help improve the situation. (Dkt. 22-1 at ¶ 28; Dkt. 23-6 at 18-19).

On April 5, 2010, the same day that Plaintiff received her PPI, four individual employees at the Rochester office reportedly observed Plaintiff arrive approximately 20 minutes late for work. (Dkt. 18-1 at ¶ 33; Dkt. 18-7 at ¶ 21; Dkt. 18-8 at 14, 18-20).

The timesheet that Plaintiff submitted to Mr. Salvaggio on April 9, 2010, stated that Plaintiff arrived for work at 8:00 a.m. on April 5, 2010. (Dkt. 18-1 at ¶ 34).

Mr. Salvaggio contacted Human Resources, submitted Plaintiff's timesheet, and later submitted statements from each of the co-worker witnesses concerning Plaintiff's late arrival to work on April 5, 2010. (Dkt. 18-1 at ¶ 36; Dkt. 18-7 at ¶¶ 21-23; Dkt. 18-8 at 14, 16, 18-20). Plaintiff alleges that Mr. Salvaggio submitted a redacted timesheet to Human Resources that removed his approval signature. (Dkt. 22-1 at ¶ 39; Dkt. 22-11 at ¶ 55).

Plaintiff claims that there was an unwritten policy where hourly employees would always fill out timekeeping forms to state 8:00 a.m. as the clock-in time and 5:00 p.m. as the clock-out time to avoid accounting for irregular hours and minutes on each day, and that she had been using that procedure for the almost eight years that she worked for SHIP. (Dkt. 22-1 at ¶ 33; Dkt. 22-11 at ¶¶ 47-48, 51). Plaintiff claims that Mr. Salvaggio was aware of this practice and did not inform her that she should change her practices until April 2010. (Dkt. 22-1 at ¶ 33; Dkt. 18-7 at ¶¶ 8, 12). Plaintiff also claims that Ms. Paris used this same method of entering time, except that she wrote 3:00 p.m. as her clock-out time because she had a different schedule. (Dkt. 22-1 at ¶ 34; Dkt. 22-11 at ¶ 50). Plaintiff has requested copies of Ms. Paris' timesheets to demonstrate that Ms. Paris followed this same method of timekeeping. (Dkt. 23). Plaintiff recalls a time in

mid-April 2010 when Ms. Paris had a medical appointment causing her to be approximately two hours late for work, and Mr. Salvaggio told Ms. Paris to put down her usual arrival time of 8:00 a.m.  (Dkt. 22-11 at ¶ 56).  Plaintiff claims that this supports her allegations of disparate treatment and retaliation.  (Dkt. 22-1 at ¶ 44; Dkt. 22-11 at ¶ 56).

According to Sears policy, when there is an allegation that an hourly employee who has been with the company for more than five years has engaged in a terminable offense, the 88Sears Associate Services Organization ("ASO") opens a case and assigns an investigator to examine the allegation.  (Dkt. 18-1 at ¶ 37; Dkt. 22-1 at ¶ 37; Dkt. 18-5 at ¶ 7).  The ASO investigator works with the Regional Human Resources Manager and the unit manager to investigate the allegations.  (Dkt. 18-1 at ¶ 37; Dkt. 22-1 at ¶ 37). The ASO must approve any form of discipline, including termination, of the employee. (Dkt. 18-1 at ¶ 37; Dkt. 22-1 at ¶ 37; Dkt. 18-5 at ¶ 7).  Mr. Salvaggio and Human Resources worked with the ASO concerning Plaintiff's alleged post-PPI tardiness.  (Dkt. 18-1 at ¶ 38; Dkt. 22-1 at ¶ 38; Dkt. 18-7 at ¶¶ 23-24).  Plaintiff argues the ASO was not provided with all relevant documentation.  (Dkt. 22-1 at ¶ 38).

Plaintiff submitted a 25 page response to the PPI.  (Dkt. 23-3 at 2-3).  In her response, Plaintiff stated that she believed the PPI was "in retaliation." (*Id.*).

After completing its investigation, the ASO approved Plaintiff's termination for falsification of a time record.  (Dkt. 18-1 at ¶ 42; Dkt. 18-7 at ¶ 27). Mr. Salvaggio testified that the determination to terminate Plaintiff was made by Human Resources, the ASO, and Mr. Salvaggio.  (Dkt. 18-7 at ¶ 27).

- 10 -

Plaintiff alleges that she was terminated "as a result of unlawful retaliation for engaging in a protected activity, the last protected act having occurred on April 7, 2010 when she stated the PPI was an act of retaliation." (Dkt. 22-1 at ¶ 44). Plaintiff denies being late to work on April 5, 2010. (Dkt. 23-11 at ¶ 43). Plaintiff notes that she received a bonus check in April 2010 from Tish Edmiston, Regional Director, for Plaintiff's performance of her job duties. (Dkt. 22-11 at ¶ 40).

Plaintiff commenced this lawsuit on April 30, 2012. (Dkt. 1). Plaintiff alleges a single count of retaliation in her complaint. (*Id.*). After the deadline for fact discovery on September 16, 2013 (Dkt. 16), Defendants filed a motion for summary judgment on December 31, 2013 (Dkt. 18). On February 17, 2014, Plaintiff filed a motion for sanctions and a motion to compel. (Dkt. 23). The case was transferred to the undersigned on February 21, 2014. (Dkt. 25). Oral argument on these motions was held on May 14, 2014, with the Court reserving decision. (Dkt. 38).

## DISCUSSION

### I.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). Once

the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec.*, 475 U.S. at 586-87) (emphasis in original). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"Summary judgment applies no less to Title VII cases than to commercial cases or other areas of litigation, and plaintiff must still offer 'concrete evidence from which a reasonable juror could return a verdict in [her] favor.'" *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998) (quoting *Anderson*, 477 U.S. at 242) (internal citations omitted) (alteration in original).

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]. . . ." 42 U.S.C. § 2000e-3(a).

Claims of retaliation for engaging in protected conduct under Title VII are examined under the *McDonnell Douglas* burden shifting test. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). "Under the *McDonnell Douglas* analysis, the plaintiff must establish a *prima facie* case of retaliation, which the defendant must rebut with a legitimate reason for the action. Then the plaintiff carries the ultimate burden of

showing that the proffered explanation is really a pretext for retaliation." *Hannah v. One Commc'ns*, No. 08-cv-6567L, 2011 WL 5282633, at *9 (W.D.N.Y. Sept. 28, 2011). "[T]he Supreme Court recently clarified the causation standard required . . . stating, 'a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer,' as distinct from 'a motivating factor,' which had previously been the standard in the Second Circuit." *Verga v. Emergency Ambulance Serv., Inc.*, No. 12-CV-1199 (DRH)(ARL), 2014 WL 6473515, at *3 (E.D.N.Y. Nov. 18, 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)).

In order to plead a *prima facie* case for retaliation under Title VII, Plaintiff must establish that: (1) she was engaged in a protected activity; (2) Defendants were aware of this activity; (3) Defendants took adverse action against her; and (4) there was a causal connection between the protected activity and the adverse action. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013). "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation omitted).

"The burden at the summary judgment stage for Plaintiff is minimal and *de minimis*, and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational

finder of fact to infer a retaliatory motive." *Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 192 (E.D.N.Y. 2013) (quotation omitted).

## A.   Prima Facie Case

### 1.   Protected Activity

"A plaintiff engages in 'protected activity' when she (1) opposes employment practices prohibited under Title VII; (2) makes a charge of discrimination; or (3) participates in an investigation, proceeding or hearing arising under Title VII." *Bundschuh v. Inn on the Lake Hudson Hotels, LLC*, 914 F. Supp. 2d 395, 405 (W.D.N.Y. 2012). Here, Plaintiff alleges that she participated in an investigation and hearing related to her co-worker's claims before the NYSDHR. (Dkt. 1 at ¶ 29). "[F]iling of a discriminat[ion] . . . charge with the DHR constitutes participation in a Title VII investigation or proceeding. . . ." *McNeil v. St. Barnabas Hosp.*, No. 94 Civ. 6215(SS), 1997 WL 729026, at *5 (S.D.N.Y. Nov. 24, 1997) (quotation omitted).

Informal protests of discrimination, such as "'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and *expressing support of co-workers who have filed formal charges*'" are recognized forms of protected activity. *Matima v. Celli*, 228 F.3d 68, 78-79 (2d Cir. 2000) (emphasis added) (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

Plaintiff claims that she engaged in the following protected activities: (1) testifying at the February 2008 NYSDHR hearing in support of Ms. Kielbasinski; (2) requesting that Defendants investigate who was harassing Ms. Kielbasinski at work

between January 2009 and March 2009; (3) submitting an affidavit to the NYSDHR in December 2009 in support of Ms. Kielbasinski's claim against Defendants; (4) offering to testify at Ms. Kielbasinski's December 1, 2009 hearing; and (5) complaining to Defendants in writing on April 7, 2010, that Plaintiff believed the April 5, 2010 PPI was in direct retaliation for Plaintiff's protected activities. (Dkt. 22 at 12-13). Defendants argue that the only alleged protected activity expressly referenced in the complaint is the filing of an affidavit with the NYSDHR, and Plaintiff is attempting to impermissibly amend her complaint through her opposition to Defendants' motion for summary judgment by relying upon additional alleged protected activities. (Dkt. 29 at 7).

The real issue in the present case is whether Plaintiff may now assert *factual allegations* that were not specifically referenced in her complaint as acts of retaliation, but nonetheless for the most part were set forth as factual allegations. In both her complaint and her opposition papers, Plaintiff alleges a single claim of retaliation under Title VII. The only action expressly referenced in the complaint as constituting protected activity is the alleged filing of an affidavit prepared by Plaintiff in December 2009. (Dkt. 1 at ¶ 29). Yet, Plaintiff does elaborate on the specific alleged protected activities that support her claim of retaliation in her opposition papers.

"Generally, courts will not consider, on a motion for summary judgment, allegations that were not pled in the complaint and raised for the first time in opposition to a motion for summary judgment." *Mahmud v. Kaufmann*, 607 F. Supp. 2d 541, 555 (S.D.N.Y. 2009), *aff'd*, 358 F. App'x 229 (2d Cir. 2009). The purpose behind this rule is "to give defendants fair notice of the nature of the plaintiff's claim." *Thomas v. Egan*, 1

F. App'x 52, 54 (2d Cir. 2001) (citing *Beckman v. United States Postal Serv.*, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000)).

However, in the present case, Plaintiff's alleged protected activities are all sufficiently supported by the complaint, the record, or Plaintiff's prior testimony so as to have given Defendants proper notice to develop responses to the allegations through discovery. *See Jones v. Fischer*, No. 9:10-CV-1331 (GLS/ATB), 2013 WL 5441353, at *15 n.23 (N.D.N.Y. Sept. 27, 2014) (considering additional bases for plaintiff's due process claim that were raised for the first time in plaintiff's papers in opposition to summary judgment); *cf. Rojas v. Roman Catholic Diocese of Rochester*, 783 F. Supp. 2d 381, 408-09 (W.D.N.Y. 2010) (rejecting new factual allegations from plaintiff's opposition papers where the factual allegations were not supported by the complaint, the record, or plaintiff's testimony). In fact, Defendants discuss the activities that Plaintiff later alleges are protected activities throughout their initial papers submitted in support of summary judgment. (*See, e.g.*, Dkt. 18-9 at 10-11, 14, 21, 23-25). In other words, Defendants' own motion papers reflect the fact that they were well aware of the protected activities relied upon by Plaintiff. Further, Defendants acknowledge that additional activities may be considered protected activities. (*See id.* at 22-23) (discussing Plaintiff's December 2008 testimony, and then stating "[e]ven if she did submit an affidavit on behalf of Ms. Kielbasinski's complaint in December 2009, this only constitutes a continuation of *her previous protected activity*. . . .") (emphasis added). As a result, the Court will consider all five of the activities Plaintiff alleges to be protected activities.

*Testifying at the February 2008 NYSDHR hearing in support of Ms. Kielbasinski*

In her claim to the EEOC, Plaintiff stated "[o]n or about February 20, 2008, I testified at an EEOC hearing on the co-worker's behalf. Since I testified at the hearing, I have been subjected to retaliation where the Respondent cautioned me that they did not appreciate employees with 'loose lips.'" (Dkt. 18-3 at 2). During her deposition, Ms. Kielbasinski stated that Plaintiff testified at her February 20, 2008 hearing. (Dkt. 18-4 at 106:13-17). Defendants note in their statement of undisputed facts: "Ms. Kielbasinski requested that Plaintiff testify at the February 2008 hearing on her behalf, and she agreed." (Dkt. 18-1 at ¶ 13). Based on this information, it appears that Defendants were aware that Plaintiff claimed retaliation based upon the protected activity of testifying at Ms. Kielbasinski's February 2008 NYSDHR hearing. By participating in a hearing before the NYSDHR, Plaintiff engaged in a protected activity. *See Bundschuh*, 914 F. Supp. 2d at 405-06.

*Requesting that Defendants investigate who was harassing Ms. Kielbasinski at work between January 2009 and March 2009*

Plaintiff references at least one conversation with Mr. Salvaggio within the text of her complaint, stating: "In January 2009, Plaintiff spoke with her supervisor, Anthony Salvaggio, about what she believed to be harassing conduct directed at Ms. Kielbasinski. At that time, Mr. Salvaggio informed Plaintiff to 'stay out of it' and informed Plaintiff that nothing could be proven." (Dkt. 1 at ¶ 11). Because Plaintiff alleged in her complaint that she complained to a supervisor, Defendants had sufficient notice to prepare a response to Plaintiff's allegation that she engaged in this protected activity.

Further, Plaintiff's informal complaint to a supervisor constitutes a protected activity. *See Matima*, 228 F.3d at 78-79.

> *Submitting an affidavit to the NYSDHR in December 2009 in support of Ms.*
> *Kielbasinski's claim against Defendants*

As Defendants acknowledge, Plaintiff explicitly states in her complaint that her protected activity included filing an affidavit on Ms. Kielbasinski's behalf. (Dkt. 1 at ¶ 17) ("In December of 2009, Plaintiff provided an affidavit in support of Ms. Kielbasinski to the EEOC hearing officer."); (*Id.* at ¶ 29) ("Plaintiff engaged in a protected activity when she provided the EEOC with an affidavit related to her co-worker's Title VII retaliation action.").

Plaintiff notes that she provided the affidavit in her complaint to the EEOC, stating "[i]n November 2009, I was contacted by the co-worker who filed a claim and asked to submit an affidavit to the EEOC in support of her retaliation claim . . .  In December 2009, shortly after I submitted my affidavit in support of my co-workers[sic] claim, Mr. Salvaggio again called me into his office." (Dkt. 18-3 at 3).

At her deposition, Plaintiff stated that she prepared an affidavit in December 2009 on Ms. Kielbasinski's behalf for her retaliation claim, and that she mailed the affidavit directly to the court. (*Id.* at 33:14-25; 34:2-24).  Plaintiff testified that Ms. Kielbasinski's attorney, Anita Roberts, also had a copy of the affidavit. (*Id.* at 35:13-19; 36:5-9).

Ms. Kielbasinski stated in her deposition that she knew Plaintiff provided a statement for her second hearing, and that she provided it directly to the court or agency.

(Dkt. 18-4 at 87:25; 88:2-16).  She recalled reviewing the statement, and that her attorney had the statement, but did not remember what the statement contained.  (*Id.* at 88:2-16).

The decision dismissing Ms. Kielbasinski's retaliation claim states that affidavits were received from Ms. Kielbasinski and her husband as well as co-worker Stacy Dignam and supervisor Joseph Pinchbeck.  (*Id.* at 115).  There is no reference to an affidavit by Plaintiff.  (*Id.*).

A copy of the alleged affidavit is attached to Plaintiff's Memorandum in Opposition as Exhibit 15.  (Dkt. 22-9 at 2).  However, Plaintiff does not have any documentation showing that an affidavit was actually submitted to the NYSDHR, and Defendants contend that this document is not enough without "a cover sheet or any other document referencing or showing that her alleged affidavit was actually submitted as she alleges." (Dkt. 18-9 at 19).  Ms. Kielbasinski's attorney was contacted by both parties during discovery and, although she provided documents from the NYSDHR hearings, she did not provide any documentation suggesting that Plaintiff had submitted an affidavit on Ms. Kielbasinski's behalf in December 2009.  (*Id.*).

Plaintiff's and Ms. Kielbasinski's testimony, combined with the production of the alleged affidavit, is sufficient to generate a question of fact as to whether Plaintiff engaged in the protected activity of submitting an affidavit to the NYSDHR on her co-worker's behalf.  Notwithstanding Defendants' credible arguments as to the sufficiency of the proof with respect to this affidavit, the issue of whether Plaintiff submitted an affidavit cannot be resolved by the Court on the papers.  However, while the parties devote extensive efforts to arguing about the existence of the affidavit in their motion

papers, the inquiry is in many respects academic because, as discussed below, even if Plaintiff could establish that she submitted an affidavit, she cannot establish that Defendants had knowledge of this alleged protected activity.  As a result, she cannot rely on the alleged affidavit to establish a *prima facie* case.

### *Offering to testify at Ms. Kielbasinski's December 1, 2009 hearing*

The transcript from the December 1, 2009 NYSDHR hearing states: "And, Judge, I would just like to note to underscore the alleged hearsay regarding Christina Costa she is available and had already testified and will verify this supposed freeze explanation." (Dkt. 22-7 at 18:20-24).  Three representatives of SHIP, including Mr. Salvaggio, Chuck Klinzing (Human Resources), and Joseph Pinchbeck (Regional Manager) were present at the December 1, 2009 hearing.  (Dkt. 22-6 at 2:23-25).  Based on this information, it seems clear that Defendants were aware that Plaintiff alleged protected activity by virtue of her offer to testify at Ms. Kielbasinski's December 1, 2009 NYSDHR hearing.  As with her initial testimony in February 2008, Plaintiff's willingness to support Ms. Kielbasinski constitutes protected activity.

### *Complaining to Defendants in writing on April 7, 2010, that Plaintiff believed the April 5, 2010 PPI was in direct retaliation for Plaintiff's protected activities*

At the end of Plaintiff's response to the PPI, she states "I find this performance issue was brought on in direct retaliation."  (Dkt. 18-3 at 80).  In Plaintiff's EEOC complaint, she states "I prepared a response to the PIP, however I was terminated on April 29, 2010 based on false allegations of timekeeping." (*Id.* at 3).  Defendants note in their statement of undisputed facts that: "[P]laintiff submitted to Mr. Salvaggio a 25-page

response to the PPI." (Dkt. 18-1 at ¶ 39). Plaintiff also references her PPI response in her complaint: "On April 7, 2010, Plaintiff submitted a detailed response to every allegation with evidence documenting the alleged violations were not violated and several of the allegations were requesting illegal and inappropriate conduct by her." (Dkt. 1 at ¶ 24). Because Plaintiff references concerns of retaliatory motive in her PPI response, and because Defendants acknowledge receipt of the PPI response, it is reasonable to find that Defendants were on notice that Plaintiff relied on her response to the PPI as protected activity.

In sum, despite the fact that Plaintiff did not explicitly allege the five separate actions as constituting protected activities within the text of her complaint, Defendants were sufficiently aware of the alleged protected activities through the factual allegations in the complaint and the record in this case, including Plaintiff's deposition testimony and EEOC filing. Indeed, Defendants' initial motion papers reference each of the alleged activities in some fashion. As a result, Plaintiff has sufficiently met her *de minimis* burden to establish that she engaged in at least five protected activities.

## 2. Defendants' Knowledge

To satisfy the knowledge requirement, nothing more than "general corporate knowledge" that Plaintiff engaged in a protected activity is needed. *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006) (quotation omitted). "[E]vidence that the specific decision-makers responsible for the adverse action were not aware of a plaintiff's protected activity is . . . relevant as some evidence of a lack of causal connection, countering plaintiff's circumstantial evidence of

proximity. . . ." *Barney v. Consol. Edison Co. of New York*, No. 99 Civ. 823, 2009 WL 6551494, at *13 (E.D.N.Y. Oct. 1, 2009), *aff'd sub nom*, 391 Fed. App'x 993 (2d Cir. 2010) (quotation omitted).  "However, even if the decision-makers deny direct knowledge of a plaintiff's protected activity, a plaintiff can still establish a *prima facie* case where there is circumstantial evidence that the decision-makers were aware of the protected activity." *Id.*

Defendants acknowledge that SHIP's representatives were present at the hearing in February 2008 and were aware of Plaintiff's participation in the hearing, satisfying the general knowledge requirement as to this protected activity. (Dkt. 18-9 at 21).  Plaintiff made her requests that Defendants investigate the harassment of Ms. Kielbasinski to Mr. Salvaggio, a supervisor.  (Dkt. 23-11 at ¶¶ 10-11).  Three representatives of SHIP, including Mr. Salvaggio, Mr. Klinzing, and Mr. Pinchbeck, were present at the December 1, 2009 hearing. (Dkt. 22-6 at 2).  Plaintiff submitted her opposition to her PPI directly to Mr. Salvaggio, her supervisor.  (Dkt. 23-11 at ¶ 36).

The only alleged protected activity that presents a significant question as to Defendants' knowledge relates to Plaintiff's December 2009 affidavit.  Plaintiff claims that she told Ms. Paris about her submission of the affidavit, and that this knowledge created "general corporate knowledge" of Plaintiff's protected activity. (Dkt. 22 at 14). Ms. Paris denies any knowledge of the affidavit. (Dkt. 18-1 at ¶ 19; Dkt. 18-4 at 14:20-24; 15:7-23).  Thus, there is a question of fact as to whether Ms. Paris did have knowledge of the alleged affidavit.  Yet, even if she was aware of the affidavit, Defendants argue that Ms. Paris' part-time position as District Administrator did not put

her in a managerial position such that her knowledge of the affidavit could impute knowledge to Defendants.  (Dkt. 18-9 at 19-20).

Here, Plaintiff has failed to establish general corporate knowledge by virtue of her claims that she told a part-time co-worker about the alleged affidavit.  *See Torres v. Pisano*, 116 F.3d 625, 636 (2d Cir. 1997) ("[F]or the knowledge of a supervisor to be imputed to the company, that supervisor must be at a sufficiently high level in the hierarchy of the company that he or she qualifies as a proxy for the company.") (quotations omitted).  "The surrounding circumstances simply do not evidence knowledge of the protected activities, and there is no evidence that a superior with the requisite knowledge encouraged an employee unaware of the protected activity to take adverse action." *Vuona v. Merrill Lynch & Co., Inc.*, 919 F. Supp. 2d 359, 383 (S.D.N.Y. 2013) (quotation omitted) (knowledge of protected activity by one individual who left the company before termination decision not sufficient to demonstrate general corporate knowledge).

As a result, Plaintiff cannot rely on the affidavit in an attempt to establish a *prima facie* case because Plaintiff has not offered proof that Defendants had knowledge of this alleged protected activity.  On the other hand, Plaintiff has sufficiently met her *de minimis* burden of demonstrating that Defendants had knowledge of her remaining protected activities.

### 3.    Adverse Employment Action

"To make a *prima facie* showing of an adverse action, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which

in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Bundschuh*, 914 F. Supp. 2d at 406 (quoting *Kessler*, 461 F. 3d at 207). Unlike a disparate treatment claim under Title VII, a retaliation claim "'is not limited to discriminatory actions that affect the terms and conditions of employment.'" *Kessler*, 461 F.3d at 207 (quoting *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 64 (2006)).

"[T]here are no bright-line rules with respect to what constitutes an adverse employment action for purposes of a retaliation claim, and therefore courts must pore over each case to determine whether the challenged employment action reaches the level of adverse." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) (quotation omitted). "[In] determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).

Plaintiff's termination alone is an adverse employment action sufficient to support her retaliation claim. *See Reynoso v. All Foods, Inc.*, 908 F. Supp. 2d 330, 342 (E.D.N.Y. 2012) ("termination clearly constitutes an adverse employment action").

Plaintiff also claims that "almost immediately after Defendants learned that, despite Defendants' warnings to Plaintiff, Plaintiff was ready and willing to testify in support of Ms. Kielbasinksi's discrimination and retaliation claims against Defendants, bad things began happening to Plaintiff." (Dkt. 22 at 16-17). These "bad things" include:

> (1) following the December 1, 2009 hearing, Defendants prohibited Plaintiff from attending further management team meetings, which she had attended since 2004, and was, indeed, required to attend pursuant to company policy; (2) selectively applied increased monitoring and scrutiny of Plaintiff; (3) failed to give Plaintiff a performance evaluation in 2010; and (4) placed Plaintiff on a [PPI] on April 5, 2010, for alleged performance issues which, non-coincidentally, purportedly began to take place in December, 2009.   Shortly following the PPI, Plaintiff was terminated.

(*Id.*). Defendants argue that, as a matter of law, these are not adverse employment actions.  (Dkt. 18-9 at 22) (citing *Parinello v. Bausch & Lomb*, No. 10-cv-6519T, 2013 WL 1680152, at *8-9 (W.D.N.Y. Apr. 17, 2013) (finding plaintiff's claims of verbal warnings, placement on PIP, reduction in work load, and being ostracized at work did not constitute adverse employment actions for ADA claim); *Quarless v. Bronx-Lebanon Hosp. Ctr.*, 228 F. Supp. 2d 377, 385-86 (S.D.N.Y. 2002) (stating that being "harassed, shunned, and subjected to an intimidating work environment" did not constitute an adverse employment action)).

Unlike a claim for discrimination/disparate treatment, actions for the purposes of a retaliation claim do not need to have such a direct impact on the terms and conditions of Plaintiff's employment to be considered adverse employment actions.  "Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct."  *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011).

In the aggregate, a reasonable trier of fact could find the conduct cited by Plaintiff would dissuade a reasonable worker from making or supporting a charge of

discrimination.   Combined with Plaintiff's ultimate termination, these additional activities will be considered as adverse employment actions for the purposes of this motion.

### 4.    Causal Connection

Proof of a causal connection between the protected activity and adverse action "can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

#### *Temporal Proximity*

With regard to demonstrating a relationship between the protected activity and the alleged retaliatory action, "'[p]roof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment. . . .'"   *White v. Eastman Kodak*, No. 06-cv-6493-CJS, 2009 WL 1514659, at *10 (W.D.N.Y. May 29, 2009) (quoting *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987)).

Plaintiff notes the December 1, 2009 hearing as the triggering date for the retaliatory activity.   (Dkt. 22 at 19).[2]   Plaintiff argues that, shortly after the December 1,

---

[2]    Although Plaintiff claims that her testimony at the February 2008 NYSDHR hearing constituted a protected activity (Dkt. 22 at 12), Plaintiff does not argue that adverse employment actions occurred until December 2009, following the revelation that

2009 hearing, where Plaintiff's name was raised as a potential witness, Defendants began to engage in the above-mentioned retaliatory activities. (*Id.*). Plaintiff claims that she was immediately excluded from management team meetings and subjected to increased monitoring, that she did not receive a performance evaluation in March 2010, and that she was placed on a PPI on April 5, 2010 for alleged performance issues documented as starting in December 2009. (*Id.*). In addition, Plaintiff notes that she was terminated just 24 days after submitting her opposition to the PPI alleging retaliation. (*Id.*). The Court finds that the sequence of events with respect to the alleged protected activity in December 2009 and after, and the alleged resulting adverse actions, all took place within a sufficient time frame to establish a *prima facie* case of retaliation. *See Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.") (quotations and citations omitted).

### *Similarly Situated Employees Treated Differently*

"Where a plaintiff seeks to derive an inference of discrimination from allegations of disparate treatment, he or she must plausibly allege the existence of at least one comparator who was more favorably treated despite being 'similarly situated to the plaintiff in all material respects,' meaning the comparator was '(1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct.'" *Green v. Dist. Council 1707*, No. 13 Civ. 8671(PAE), 2014 WL 3734101, at

---

Plaintiff was ready and willing to testify for Ms. Kielbasinski at a second NYSDHR hearing (*id.* at 16).

*5 (S.D.N.Y. July 29, 2014) (quoting *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493-94 (2d Cir. 2010)). That "does not mean that the plaintiff and the compared co-employees must be identical. In the context of employee discipline, however, the plaintiff and the similarly situated employee must have engaged in comparable conduct, that is, conduct of comparable seriousness." *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014) (quotations omitted).

Plaintiff alleges that she was singly treated differently from similarly situated employees in the Rochester office. (Dkt. 22 at 20). For example, Plaintiff claims that, after December 2009, she was excluded from weekly management team meetings, despite the fact that part of her job description includes participating in these meetings and recording minutes. (Dkt. 22 at 20; Dkt. 23-11 at ¶ 18). Plaintiff claims she was the only employee excluded from these weekly management meetings of those individuals who had regularly attended in the past. (Dkt. 22 at 20). Plaintiff also alleges that she was the only employee instructed by Mr. Salvaggio to "speak only when spoken to," and the only employee who underwent additional monitoring and scrutiny. (*Id.*). Further, Plaintiff claims that she was the only Rochester employee who did not receive a performance evaluation in 2010. (*Id.*).

Mr. Salvaggio testified that Plaintiff did not receive formal performance reviews due to a wage freeze. (Dkt. 18-7 at ¶ 11). Mr. Salvaggio indicated that he engaged in additional monitoring of Plaintiff's work because he noticed that she "would question or fail to follow instructions from management," and would "investigate and audit projects that did not fall under her job description," thereby creating "distraction for the

employees in these positions rather than constructive assistance." (*Id.* at ¶ 9). These varying versions of the conditions of Plaintiff's employment present issues of fact best reserved for a jury.

Plaintiff also believes that Defendants permitted Ms. Paris, the other hourly employee in the Rochester office, to falsify her time records in April 2010 to reflect that she had arrived at work at 8:00 a.m. when she did not do so until 10:00 a.m. because of a medical appointment. (Dkt. 22 at 20-21). Plaintiff testified that she recalled Ms. Paris arriving to work late due to a medical appointment, and then observed that Ms. Paris' timesheet from that week did not reflect that she arrived later than 8:00 a.m. (Dkt. 22-11 at ¶ 56). This testimony creates an issue of fact as to whether Defendants permitted another hourly employee in the office to misstate her arrival time on her timesheet in the same month that Plaintiff was terminated for arguably the same conduct. Indeed, Plaintiff contends that the general historical practice in the office was to consistently have hourly workers put the same work hours on their timesheets, regardless of their actual arrival and departure times. (Dkt. 22-1 at ¶ 33; Dkt. 22-11 at ¶ 50).

### *Direct Retaliatory Animus*

Plaintiff has also presented evidence of retaliatory animus. Plaintiff alleges that after testifying at Ms. Kielbasinski's February 2008 hearing, one of Defendants' regional managers, Joseph Pinchbeck, "warned Plaintiff that she should be a good employee and made veiled threats including telling Plaintiff 'the company did not like loose lips.'" (Dkt. 22-1 at ¶ 14; Dkt. 22-11 at ¶ 9). After Ms. Kielbasinski quit her position in March 2009, Plaintiff alleges that Mr. Salvaggio told Plaintiff, "[t]he problem is gone; enough of

this drama. You need to be a team player." (Dkt. 22-1 at ¶ 14; Dkt. 22-11 at ¶ 11). A reasonable fact-finder could conclude that these statements reflected Defendants' displeasure with Plaintiff's participation in her co-worker's NYSDHR claims and proceedings, and constituted veiled threats of retaliation. *See Vosburgh v. Am. Nat'l Red Cross*, No. 5:08-CV-0653 (LEK/TWD), 2014 WL 4826688, at *11-12 (N.D.N.Y. Sept. 29, 2014) (finding supervisor's statement that "even high achievers could be terminated if they were not good team players" evidence of "impermissible retaliation against Plaintiff for engaging in protected activity"); *Dangler v. N.Y.C. Off Track Betting Corp.*, 193 F.3d 130, 142 (2d Cir. 1999) (denying motion to dismiss First Amendment retaliation claim where supervisor threatened to fire employee because he was not a "team player"); *Wallace v. Suffolk Cnty. Police Dep't*, 396 F. Supp. 2d 251, 255, 262 (E.D.N.Y. 2005) (employer's statements that employer would not "take kindly" to Plaintiff's negative comments about the employer presented some evidence of retaliatory animus).

As a result, Plaintiff has met her *de minimis* burden to establish a *prima facie* case of retaliation. The burden then shifts to Defendants to present a legitimate business reason for Plaintiff's termination.

## B.    Legitimate Business Reason

Defendants argue that even if Plaintiff demonstrated a *prima facie* case for retaliation, Defendants have a legitimate, non-retaliatory reason for Plaintiff's termination – her falsification of time records. (Dkt. 18-9 at 26). "A defendant's burden at this stage is, like the plaintiff's initial burden to establish a *prima facie* case, not a demanding one; [a defendant] need only offer [a lawful] explanation for the employment

decision." *Kanhoye v. Altana*, 686 F. Supp. 2d 199, 207 (E.D.N.Y. 2009) (quotation omitted) (alterations in original).   "Although the presumption shifts the burden of *production* to the defendant, the ultimate burden of persuading the trier of fact that the defendant retaliated against the plaintiff remains at all times with the plaintiff." *Giscombe v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 464(AT), 2014 WL 3974582, at *3 (S.D.N.Y. Aug. 12, 2014) (quotations omitted).

Plaintiff was given her PPI on April 5, 2010.   (Dkt. 18-3 at 76-77).   Plaintiff reportedly arrived late to work on April 5, 2010.   Four co-workers reported observing Plaintiff arrive to work late on April 5, 2010. (Dkt. 18-8 at 14, 18-20).

The PPI outlines seven dates that Plaintiff was allegedly observed to be tardy to work, and states that "[d]espite the tardiness outlined above, [Plaintiff] submitted timesheets that indicate on each of the above dates that [she] arrived at 8:00 A.M. Submission of intentionally falsified timesheets constitutes a terminable policy violation. Don't let it happen again." (Dkt. 28-2 at 53).

Plaintiff submitted a timesheet on Friday, April 9, 2010, indicating that she had arrived to work at 8:00 a.m. on April 5, 2010.  (Dkt. 23-4 at 6).

Mr. Salvaggio contacted Human Resources and the ASO initiated an internal investigation in accordance with SHIP's policy.   (Dkt. 23-4 at 8-9).   Plaintiff's termination was recommended and approved by a third party division of Sears that had no prior involvement with Plaintiff. (Dkt. 18-9 at 27).

Falsification of a time record is a terminable offense under SHIP's policy.  (Dkt. 18-9 at 27; Dkt. 18-5 at ¶ 9).  Plaintiff denies being late for work on April 5, 2010.  (Dkt. 23-11 at ¶ 43).

Although there is a question of fact as to whether Plaintiff was actually late on April 5, 2010 and recorded her time otherwise so as to justify her termination under SHIP policy, Defendants have met their burden of articulating a legitimate, non-retaliatory reason for taking adverse employment action against Plaintiff based on the belief that she did falsify her time records after being late on that date.

As for Plaintiff's additional alleged adverse employment actions, Mr. Salvaggio claimed that Plaintiff did not receive formal performance reviews due to a wage freeze. (Dkt. 18-7 at ¶ 11).  Defendants argue that Plaintiff's assertions that she was left out of weekly business meetings "are conclusory allegations without any foundation or context."  (Dkt. 29 at 14).  Mr. Salvaggio indicated that he engaged in additional monitoring of Plaintiff's work because he noticed that she "would question or fail to follow instructions from management," and would "investigate and audit projects that did not fall under her job description," thereby creating "distraction for the employees in these positions rather than constructive assistance." (Dkt. 18-7 at ¶ 9).  Defendants argue that "[t]he increased monitoring and scrutiny of Plaintiff's work was justified by the deficiencies in her work performance."  (Dkt. 29 at 14-15).

Although Defendants have not directly referenced legitimate business reasons for each of Plaintiff's additional alleged adverse actions in their motion papers, legitimate business reasons are articulated and supported by the record.  As a result, Defendants

have at least offered an explanation for their employment decisions to satisfy their burden at this stage of the retaliation analysis.

## C.    But-For Causation

As Defendants have articulated a legitimate and lawful rationale for their adverse actions, "the inference of discrimination drops out of the picture and the burden of production shifts back to the plaintiff to show that the defendant's articulated reason was merely a pretext." *Kanhoye*, 686 F. Supp. 2d at 207 (quotation omitted).

"The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 133 S. Ct. at 2534. "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 2533. "If the employer succeeds at [demonstrating a legitimate non-retaliatory reason for termination], the presumption of retaliation dissipates, and the plaintiff must show that, *but for* the protected activity, she would not have been terminated." *Joseph v. Owens & Minor Distrib.*, 5 F. Supp. 3d 295, 315 (E.D.N.Y. Mar. 24, 2014) (emphasis in original). "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan,* 737 F.3d at 846.

"A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its

action." *Id.* So although temporal proximity is insufficient to defeat summary judgment at the pretext stage, "a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Id.* at 847 (finding employer's shifting and inconsistent explanations for plaintiff's termination in combination with the temporal proximity between plaintiff's protected activity and her termination, sufficient to survive the summary judgment stage).

Here, Plaintiff has offered proof of a temporal proximity between at least some of the alleged protected activity and alleged adverse actions. She has also put forward proof (albeit, solely based on her version of events) that she was treated differently than similarly situated employees. In addition, she has evidence of comments directed to her by management-level employees of Defendants expressing displeasure that Plaintiff engaged in protected activity of assisting another employee with her discrimination complaints, including making such comments as "the company did not like loose lips." (Dkt. 22-1 at ¶ 14; Dkt. 22-11 at ¶ 12).

Further, despite Mr. Salvaggio's complaints concerning Plaintiff's work performance, the Regional Manager continually rewarded Plaintiff for her strong work performance, even giving Plaintiff a bonus in April and May 2010. (Dkt. 23-11 at ¶ 40). Although "[d]emonstration of past positive performance is insufficient to raise a genuine issue of disputed fact with respect to pretext," *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 577 (S.D.N.Y. 2010) (quotation omitted)*,* this evidence in combination with Plaintiff's other evidence supports an argument of pretext.

As a result, the Court concludes that there are disputed issues of material fact as to whether Defendants' proffered reasons for the alleged adverse actions were a pretext for retaliation, and unlawful retaliation was the but-for cause of the adverse actions. *See Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) ("A jury might credit all of this proffered evidence, some of it, or none at all. But that is left for the jury to decide at trial. And if at least some of this evidence is believed by a jury, that jury could also conclude that, despite [plaintiff's] negative performance reviews, his firing was more likely than not based in whole or in part on discrimination, and that the unlawful retaliation would not have occurred but-for the alleged wrongful actions.") (quotations and citations omitted); *see also Johnson v. Cnty. of Nassau*, No. 10-CV-06061(JFB)(GRB), 2014 WL 4700025, at *1 (E.D.N.Y. Sept. 22, 2014) (where there was a question of fact as to whether plaintiff-employee would have been transferred but for retaliatory motive, summary judgment as to Title VII retaliation claim was denied); *Dushane v. Leeds Hose Co. #1*, 6 F. Supp. 3d 204, 214 (N.D.N.Y. 2014) ("Ultimately, Defendants' motivation for terminating Plaintiff is a disputed issue of fact not yet suitable for resolution."); *Puglisi v. Town of Hempstead Sanitary Dist. No. 2*, No. 11-CV-0445(PKC), 2013 WL 6061984, at *6 (E.D.N.Y. Nov. 15, 2013) (finding questions of fact concerning temporal proximity and disparate treatment created issue for a jury, such that a jury could find that retaliation was a but-for causation for the alleged adverse employment actions); *Jeffrey v. Montefiore Med. Ctr.*, No. 11 Civ. 6400(RA), 2013 WL 5434635, at *24 (S.D.N.Y. Sept. 27, 2013) ("Because the Court is not permitted to make

credibility assessments at this stage, summary judgment on Plaintiff's retaliation claim is inappropriate.") (citation omitted).

Accordingly, Defendants' motion for summary judgment is denied.

## II.   PLAINTIFF'S MOTION FOR SANCTIONS

On February 17, 2014, Plaintiff filed a motion for "an order striking Defendants' answer pursuant to Fed. R. Civ. P. 37(b)(2)" based on Defendants alleged spoliation of evidence. (Dkt. 23). Specifically, Plaintiff claims that Defendants shredded the personal file of Mr. Salvaggio, which contained relevant documents related to Plaintiff's termination, even though Defendants were aware of the relevancy of these documents to Plaintiff's retaliation lawsuit. (Dkt. 23-13 at 8-9).

Plaintiff moves for sanctions pursuant to Fed. R. Civ. P. 37(b)(2). As explained by this Court:

> Under Rule 37 of the Federal Rules of Civil Procedure, courts have broad discretion to sanction a party for failing to produce or destroying relevant and discoverable evidence. *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (discussing court's authority to impose sanctions under Fed. R. Civ. P. 37 where party destroys evidence in violation of court order or under court's inherent power in absence of court order); *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002). Available sanctions include, *inter alia*: (1) an adverse inference jury instruction; (2) a preclusion order; (3) an order striking all or part of the pleadings; and (4) an order dismissing all or part of the action. Fed. R. Civ. P. 37(b)(2)(A)(i)-(vi); 37(c)(1)(c).

*Riley v. Marriott Int'l, Inc.*, No. 12-CV-6242P, 2014 WL 4794657, at *5 (W.D.N.Y. Sept. 25, 2014). "Even without a discovery order, a district court may impose sanctions for spoliation, exercising its inherent power to control litigation." *West*, 167 F.3d at 779.

"The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." *Fujitsu Ltd.*, 247 F.3d at 436 (citation omitted).

Plaintiff's motion is based on Mr. Salvaggio's testimony that he kept a personal file in his office containing notes on Plaintiff's work performance. (Dkt. 28-2 at 3:2-14). These notes, according to Mr. Salvaggio, included records of Plaintiff's alleged tardiness and were used to prepare Plaintiff's PPI. (*Id.* at 17:3-24). Plaintiff also believes that Mr. Salvaggio's personal file contained Plaintiff's original Associate Timekeeper's Form that was faxed to SHIP's ASO on April 9, 2010. (Dkt. 23-13 at 8).

Plaintiff filed her EEOC retaliation claim on June 7, 2010. (Dkt. 18-3 at 2). On February 3, 2012, the EEOC issued Plaintiff's right-to-sue letter. (*Id.* at 5). Plaintiff commenced this federal lawsuit on April 30, 2012. (Dkt. 1). Defendants answered the complaint on July 16, 2012. (Dkt. 5).

As a result, Plaintiff argues that Defendants were aware of the relevancy of Plaintiff's personnel information and had an obligation to preserve the evidence of Mr. Salvaggio's original personal file on Plaintiff at the very least by July 16, 2012. (Dkt. 23-13 at 7).

Mr. Salvaggio testified that when he left his general manager position with Defendants, he mailed a copy of his personal file on Plaintiff to Human Resources headquarters in Pittsburgh, and that on or around December 2012, Defendants shredded the original contents of this file at the Rochester location. (Dkt. 28-2 at 17:3-18).

Plaintiff argues that Defendants had a duty to preserve the evidence in Mr. Salvaggio's personal file, and therefore acted culpably in destroying the evidence. (Dkt. 23-13 at 8-9).

Defendants argue that a complete copy of Mr. Salvaggio's personal file was included in Plaintiff's personnel file, which was produced in its entirety to Plaintiff after Mr. Salvaggio's deposition. (Dkt. 28 at 9-10). Defendants state that every item that Mr. Salvaggio identified as included in his personal file was produced with the personnel file. (*Id.* at 11-12).

Plaintiff maintains that, despite being provided with a copy of the Human Resources personnel file, Plaintiff has not received copies of certain documents that Mr. Salvaggio testified were in his personal file. (Dkt. 37 at 8). This claim is not supported by the record. A closer examination of Plaintiff's arguments shows that Plaintiff has misconstrued Mr. Salvaggio's testimony to suggest that she did not receive documents allegedly contained in Mr. Salvaggio's personal file. For example, Plaintiff's counsel states:

> Mr. Salvaggio specifically stated that "[t]he PPI wasn't the only thing. I mean, there was[sic] records of her coming in late. There were complaints from other employees, other things." Again, these documents and records have not been produced by Defendants, including, but not limited to, the purported complaints against Plaintiff by employees and "other things."

(Dkt. 37-1 at ¶ 12). This statement, out of context, may lead the Court to believe that Mr. Salvaggio testified that these documents and records were in his personal file. However, Mr. Salvaggio provided this response following a question regarding examples of

documentation of the deterioration of Plaintiff's work product, not a question concerning the contents of his personal file.  (Dkt. 23-6 at 4:16-25).

Although Mr. Salvaggio testified that he kept a separate personal file on Plaintiff, he also testified that a copy of that file was sent to Human Resources to be incorporated into Plaintiff's personnel file.  (Dkt. 28-2 at 17:10-18).  There is no evidence before the Court to suggest that there were documents in the original personal file that were not copied and incorporated into the personnel file provided to Plaintiff.  In fact, the record provided to the Court includes at least a portion of Mr. Salvaggio's notes on Plaintiff's alleged performance issues and tardiness.  (Dkt. 18-8 at 6).

Therefore, Plaintiff has failed to demonstrate that Defendants engaged in spoliation of evidence, culpably or otherwise, to warrant the imposition of sanctions under Fed. R. Civ. P. 37.  Accordingly, Plaintiff's motion for sanctions is denied.

## III.  PLAINTIFF'S MOTION TO COMPEL

On February 17, 2014, Plaintiff filed a motion seeking "an order compelling Defendants to produce outstanding documents requested in plaintiff's several requests for production pursuant to Fed. R. Civ. P. 37(a)."  (Dkt. 23).   Specifically, Plaintiff seeks production of documents confirming the date and time of Ms. Paris' MRI and also Ms. Paris' Associate Timekeeper forms for 2009 through April 2010.  (*Id.*).

"Federal Rule of Civil Procedure 37(a) allows a party to apply to the Court for an order compelling discovery, with that motion including a certification that the movant in good faith conferred or attempted to confer with the party not making the disclosure to

secure that disclosure without court intervention." *Adams v. Buffalo Public Schs.*, No. 13CV435A, 2014 WL 3882182, at *5 (W.D.N.Y. Aug. 7, 2014).

On July 19, 2013, Defense counsel mailed Plaintiff's counsel a letter stating "[w]e acknowledge that you made several requests during depositions for additional documents from SHIP. Please provide us with a request in writing for any such documentation." (Dkt. 34 at 27). On August 6, 2013, Plaintiff's counsel requested, *inter alia*, the production of documents confirming the date and time of Ms. Paris' MRI and the production of Ms. Paris' Associate Timekeeper forms for April 2010.[3] (Dkt. 23-9 at 6). Defense counsel did not respond to this request. On September 10, 2013, Plaintiff's counsel sent a second letter requesting these documents. (*Id.* at 9).

On September 16, 2013, Defense counsel responded with objections to the document demands. (*Id.* at 12-17). Defense counsel stated that documentation confirming the date of Ms. Paris' MRI was confidential and protected by HIPAA, and was not relevant to the claims or defenses in the litigation. (*Id.* at 12). Defense counsel also stated that Ms. Paris' time keeping forms for April 2010 were confidential and not relevant to the claims or defenses in the litigation. (*Id.*).

Factual discovery in the case closed on September 16, 2013, with any motions to compel discovery due at least thirty days before the factual discovery cutoff. (Dkt. 16 at 1).

---

[3]     Plaintiff's counsel first requested Ms. Paris' Associate Timekeeper forms for the entire year of 2009 through April 2010 in his letter dated October 30, 2013. (Dkt. 34 at 30). In his earlier requests, Plaintiff's counsel sought only the time records for April 2010. (*See* Dkt. 23-9 at 6, 9).

On October 30, 2013,[4] Plaintiff's counsel sent Defense counsel a demand letter requesting the production of these documents. (Dkt. 34 at 30-31). Plaintiff's counsel argued that the date and time of Ms. Paris' MRI was not confidential as the existence of the MRI was discussed by Mr. Salvaggio and Ms. Paris in their depositions, and Plaintiff merely sought the date and time of the appointment. (*Id.* at 30). Further, Plaintiff's counsel argued that the time records of the only other hourly employee in the Rochester office were protected by an order of confidentiality and were highly relevant to Plaintiff's claims of disparate treatment. (*Id.* at 31).

On December 10, 2013, Defense counsel replied by letter, refusing to produce these documents. (*Id.* at 23-24). Defense counsel stated that they did not possess Ms. Paris' medical records and that any record indicating the date and time of the MRI would need to be produced by Ms. Paris' doctor, which would be prohibited by HIPPA. (*Id.* at 23). Defense counsel also argued that the timekeeping records of Ms. Paris were not relevant to Plaintiff's claims and would not reasonably lead to the discovery of admissible evidence. (*Id.* at 24).

In her current motion to compel, Plaintiff argues that it is irrelevant that Ms. Paris' records may be confidential because there is a stipulation and order of confidentiality in place. (Dkt. 23-13 at 13). Plaintiff further argues that the records are highly relevant to show disparate treatment, as the evidence would show that Ms. Paris, the only other

---

[4]    Plaintiff's counsel does not state that he sent a letter to Defendants on October 30, 2013; rather, he claims that he sent a letter on December 6, 2013. (Dkt. 23-9 at 19-20). Defense counsel denies receiving a letter dated December 6, 2013, but attaches an identical letter dated October 30, 2013, that she claims to have received. (Dkt. 32 at ¶ 46; Dkt. 34 at 30-31).

hourly employee in the Rochester office, was permitted to put her arrival time as 8:00 a.m. when she was tardy due to an appointment, while Plaintiff was terminated for a similar practice. (*Id.*).

Plaintiff's motion to compel is untimely. The deadline for fact discovery in this matter expired on September 16, 2013. (Dkt. 16). The amended scheduling order stated that "[a]ll motions to compel discovery shall be filed at least thirty (30) days <u>prior</u> to the factual discovery cutoff." (*Id.*) (emphasis in original).

Plaintiff's counsel submitted his letter requests for additional documents on August 6, 2013 and September 10, 2013, and Defense counsel responded with objections to the letter requests on September 16, 2013, the final date for fact discovery. Despite these outstanding discovery issues, Plaintiff did not request an extension of the discovery deadlines and did not file the instant motion to compel until February 17, 2014. (Dkt. 23). Plaintiff should have timely requested an extension of the discovery deadline to hash out the arguments concerning the production of these documents well in advance of the deadline to file a motion to compel discovery.

Because Plaintiff's motion to compel is untimely, Plaintiff's motion to compel is denied. *See Owen v. No Parking Today, Inc.*, 280 F.R.D. 106, 113 (S.D.N.Y. 2011) ("A party ordinarily must file a motion to compel *before* the close of discovery and if it fails to do so, the motion will be deemed untimely. Defendant's motion thus fails for this reason alone.") (citations omitted); *Funderburke v. Canfield*, No. 13-CV-6128G, 2014 WL 6390577, at *1 (W.D.N.Y. Nov. 7, 2014) (denying motion to compel as untimely).

The Court notes that this determination should not be construed as reaching a determination concerning the relevancy of the documents, nor should it be construed as barring Plaintiff from pursuing the production of these records through trial subpoenas.

## IV.    DEFENDANTS' REQUEST FOR RULE 11 SANCTIONS

Defendants request that this Court consider imposing sanctions against Plaintiff's counsel pursuant to Fed. R. Civ. P. 11(c)(3) for the filing of the motions for sanctions and to compel.  (Dkt. 32 at ¶ 60).  Under this rule, the Court may impose sanctions on its own initiative.  Fed. R. Civ. P. 11(c)(3).  "Sanctions may be – but need not be – imposed when court filings are used for an 'improper purpose,' or when claims are not supported by existing law, lack evidentiary support, or are otherwise frivolous."  *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012).  "Further, even when a district court finds a violation of Rule 11, '[t]he decision whether to impose a sanction . . . is . . . committed to the district court's discretion.'"  *Id.* (quoting *Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004)).  The Court does not find that sanctions are appropriate, and therefore Defendants' request is denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 18) is denied.  Plaintiff's motion for sanctions and motion to compel (Dkt. 23) are denied. Defendants' request for Rule 11 sanctions (Dkt. 32 at ¶ 60) is also denied.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:  December 15, 2014
            Rochester, New York